# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) BRENDA SIMMONS,

(2) TUESDAE BOWLING,

(3) KIMBERLY MCKINZIE,

(4) REBECCA PARKER,

    on behalf of themselves and
    all others similarly situated,

        Plaintiffs,

v.

(1) OKLAHOMA HEART HOSPITAL, LLC, D/B/A OKLAHOMA HEART HOSPITAL PHYSICIANS GROUP,

(2) OHH PHYSICIANS, LLC,

        Defendants.

Case No. CIV-17-607-M

**JURY TRIAL DEMANDED ON ALL CLAIMS**

## VERIFIED COMPLAINT

Plaintiffs Brenda Simmons ("Simmons"), Tuesdae Bowling ("Bowling"), Kimberly McKinzie ("McKinzie"), and Rebecca Parker ("Parker") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this cause of action against Oklahoma Heart Hospital, LLC d/b/a Oklahoma Heart Hospital Physicians ("OHH") and OHH Physicians LLC ("OHHP") (collectively, "DEFENDANTS") and state as follows:

1

## Parties

1. Defendants Oklahoma Heart Hospital, LLC ("OHH") is an Oklahoma limited liability company doing business as Oklahoma Heart Hospital Physicians with its primary place of business in Oklahoma City, Oklahoma.

2. Defendants OHH Physicians LLC ("OHHP") is an Oklahoma limited liability company entity related to OHH with its primary place of business in Oklahoma City, Oklahoma.

3. OHH and OHHP, collectively, Defendants, style themselves and other related entities operate collectively as a physician-owned hospital system, designed by cardiologists to empower cardiovascular specialists to bring world-class medical expertise and compassion to the care of every patient.

4. Plaintiff Brenda Simmons is a citizen of the United States and resides in Oklahoma City, Oklahoma. She was a Medical Transcriptionist for Defendants from 2015 to 2017.

5. Plaintiff Tuesdae Bowling is a citizen of the United States and resides in Oklahoma City, Oklahoma. She was a Medical Transcriptionist for Defendants from 2015 to 2016.

6. Plaintiff Kimberly McKinzie is a citizen of the United States and resides in Broken Arrow, Oklahoma. She has been a Medical Transcriptionist for Defendants since 2010.

7. Plaintiff Rebecca Parker is a citizen of the United States and resides in Tulsa, Oklahoma. She has been a Medical Transcriptionist for Defendants since 2010.

8. Plaintiffs consented in writing to be a part of this FLSA collective action pursuant to 29 U.S.C. §216(b). Plaintiffs' signed consent forms are attached as Exhibit 1 to this Complaint.

9. Plaintiffs bring this case individually and as an "opt-in" collective action under 29 U.S.C. § 216(b) on behalf of all those who file a consent to join form with the Court.

10. Defendants employ many individual employees as Medical Transcriptionists at any given period of time.

11. The number and identities of potential opt-in Plaintiffs may be easily determined from Defendants' records.

### Jurisdiction and Venue

12. The FLSA authorizes court actions by private parties to recover damages for violation of the wage and hour provisions contained within the FLSA. Jurisdiction over Plaintiffs' FLSA claims is based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

13. At all times material to this action, Defendants are and/or have been the "employer" of Plaintiffs and those similarly situated within the meaning of 29 U.S.C. § 203(d).

14. At all times material to this action, Plaintiffs and those similarly situated are and/or have been "employees" of Defendants as defined

by 29 U.S.C. § 203(e)(1), and worked for Defendants within the territory of the United States within three (3) years preceding the filing of this lawsuit.

15. Plaintiffs and those similarly situated are non-exempt employees within the meaning of the FLSA.

16. At all times material to this action, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce as defined by 29 U.S.C. § 203(s)(1) of the FLSA, with annual revenue in excess of $500,000.00. At all times material to this action, Defendants have been engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 201(s)(1)(B).

17. Venue in this Court is proper under 28 U.S.C. § 1391(b) because the occurrences in question substantially occurred in the this District, at least one of named Plaintiffs resides in this District, a significant number of putative class members reside in this District, and Defendants is located in this District.

## Factual Allegations

### *General Work Duties*

18. Plaintiffs are current or former employees of Defendants who performed Medical Transcriptionist ("MT") related work duties.

19. These MTs served as "telecommuting" employees of Defendants, who commonly performed transcription work from home.

4

20. MTs transcribed doctor dictations for a variety of medical records such as referring physician letters, clinic notes, clinic diagnostic reports, patient histories, physical examinations, emergency room visits, operations, chart reviews, and consultation and discharge summaries.

21. MTs returned dictated reports in printed or electronic form for physicians' review, corrections, and signature, and for inclusion in patients' medical records.

22. Defendants' uniform job description and offer letter for MTs specifically notes the position's "FLSA status" as "NON-EXEMPT," thus requiring the payment of overtime and minimum wage for all time worked and obligating Defendants to maintain accurate records of hours worked and wages paid to MTs.

23. Defendants required MTs to: translate medical jargon and abbreviations into their expanded forms to ensure the accuracy of patient and health care facility records; know medical office procedures; identify mistakes in reports and check with doctors to correct information; recognize inconsistencies in medical terms; review, edit and proofread reports or dictated material for spelling, grammar, clarity, consistency, and proper medical terminology; have working knowledge of and proficiency in their medical transcription platform and related software; exhibit a "bring it on" work ethic by being solution- and team-oriented, flexible, and positive; not take

excessive or abusive breaks; and attend 90% of team and departmental meetings.

24. To facilitate the work-at-home arrangement, Defendants provided MTs with equipment and software necessary to perform transcription and with access to Defendants' IT technical support.

### *Compensation*

25. Defendants compensated MTs based on production (*i.e.*, at a flat rate per line of transcription produced), commonly at the rate of approximately eleven (11) cents per line.

26. Defendants did not instruct MTs to record their hours worked per workweek. Defendants did not seek to track or keep accurate records of hours worked by MTs, nor record hours worked by MTs on their paystubs.

27. Defendants removed MTs' access to information about the amount of lines typed by the MTs on Defendants' medical transcription platform accessible by Plaintiffs, and Defendants did not list line counts on MTs' paystubs.

28. Defendants listed a pay rate of, for example, $16.00 per hour on MTs' paystubs.

29. Defendants did not record or maintain accurate records of hours worked by MTs for purposes of compensation. In failing to do so, Defendants failed to satisfy their duties as an employer under the FLSA.

30. MTs' production pay did not include compensation for any other activities beyond line production.

31. Defendants specifically and repeatedly informed MTs that they received pay based only upon their actual production of lines.

32. Defendants told MTs they could not make a higher rate than their production rate, commonly about eleven (11) cents per line.

33. Supervisors specifically informed MTs that they were not entitled to additional compensation beyond their line rate (*i.e.*, for any time spent completing any other task beyond line production).

34. Defendants denied MTs further benefits or pay, including paid time off, after MTs met their quotas for the amount of hours that they worked based on lines produced.

### *Production, Quality, and Timeliness Requirements*

35. Defendants required MTs to meet minimum production, quality and timeliness standards for their work.

36. Defendants did not guarantee any particular amount of work would be available at any given time. Defendants specified, however, that full-time MTs worked full-time schedules.

37. Defendants expected MTs to produce 150 lines per hour.

38. Defendants had a minimum production standard of 110 lines per hour.

39. Defendants specifically identified 6000 lines per week (*i.e.*, 150 lines per hour) as 40 hours of production time.

40. Defendants noted these production expectations and standards as critical to their success.

41. Defendants required MTs to ensure that the transcribed and edited lines of the medical records reflect rates of accuracy in excess of 99%.

42. With respect to timeliness, Defendants generally considered an acceptable turnaround time to be 24-48 hours.

43. MTs were evaluated on, *inter alia*: their ability to maintain their average lines while at the same time maintaining a high level of accuracy; their knowledge of medical office procedures; their review, editing and proofreading of reports and dictated materials; ability to maintain a proper database of documentation for reports transcribed; their turnaround times; and communication with physicians.

44. MTs unable to meet these production, quality, and timeliness standards were subject to discipline and/or termination of employment.

45. Discretionary bonuses to MTs were based upon annual evaluations regarding successful performance of all of their duties and work performed—not just line production.

### *Equating Line Counts to Hours Worked*

46. Defendants developed internal calculations of production time based on lines produced per week.

47. At around eleven (11) cents per line at a rate of 150 lines per hour, MTs would earn about $16.00 per hour.

48. MTs commonly produced more than 4,400 or 6,000 lines per workweek.

49. Based upon the lines typed exceeding what Defendants considered a 40 hour workweek, Defendants knew or should have known that MTs were working in excess of 40 hours per workweek without overtime compensation.

50. MTs were provided specific examples as to their hourly rate based upon their lines produced per hour.

51. Defendants used this hourly rate conversion to calculate accrued paid time off ("PTO") for MTs.

52. Defendants' own records demonstrate Defendants' production-based understanding that MTs worked overtime without overtime pay.

53. For example, in one biweekly pay period (*i.e.*, February 26, 2017 to March 11, 2017), named Plaintiff Simmons earned $1926.29, typing 17,511 lines at a rate of eleven (11) cents. According to Defendants' understanding and expectations regarding line production per hour (*i.e.*, an average of 110 to 150 lines per hour), Simmons would have worked between 117 to 160 hours during this biweekly pay period without any compensation for overtime hours worked.

### *Unpaid Transcription-Related Duties*

54. Beyond the production pay and production time worked, Defendants did not track or compensate non-productive time worked by MTs.

55. MTs' production pay did not account for all of the non-productive activities they performed.

56. Defendants specifically indicated to MTs that they are compensated based on production of lines of transcription, subject to withholding taxes, and would not be compensated for any other work-related activity.

57. MTs performed various non-productive tasks which were essential to the accurate editing and transcribing of medical reports, but did not receive compensation therefor.

58. MTs' duties that were essential to the accurate editing and transcription of medical reports included: retrieving the patient's medical record number and name to verify the correct individual's record is being consulted; ascertaining the patient's name, date of birth, and date of visit to the physician and hospital are correct; ensuring the dictator's name is entered correctly; making sure all preliminary background information is entered correctly and, if the dictator does not provide the date of the report, looking up the correct information to determine the date; ensuring the attending physician's name is entered and marked to receive a copy of the patient report; communicating with other MTs as a team, Defendants' management, and doctors via phone, e-mail and text message; ensuring the accuracy of physician and patient personal information to verify locations, addresses, and proper inputting of

medications; ensuring the proper medical term (in terms of spelling and definition) is inserted into the medical record; communicating with technical support in order to troubleshoot technical problems or defects with Defendants' transcription/editing platform and/or voice-recognition software; picking up medical records from medical offices or facilities for transcription purposes; and notifying Defendants that they would be away from the keyboard for certain periods of time.

59. MTs performed additional, uncompensated work in the preparation and finalization of hospital dictation records that were submitted. This work included, *inter alia*, downloading files to be transcribed and searching for emergency transcriptions ("STATs"). MTs' work was also subject to physician review, requests for additional transcription, and/or corrections prior to signature. Such changes and adjustments in patient medical records were completed as part of the reports upon which MTs were evaluated.

60. Defendants also required the typing of information and lines (which were not tracked by the transcription platform) for which MTs were not compensated, including appending metadata and other information within the transcription platform during the production flow processes.

### *Other Unpaid Time Worked*

61. MTs had to "watch for work," which means monitoring the transcription queue for dictations to become available.

62. MTs were on-call, including certain hours during the day during which Defendants expected MTs to be ready and available to work. MTs commonly received texts and phone calls from doctors or hospital personnel to quickly complete STATs or begin working. Defendants provided each MT with an OHH email address and frequently sent emails and information regarding work-related matters.

63. Initial training on, installation of, and configuration of Defendants' transcription software platform was uncompensated.

64. Initial employee orientation was uncompensated.

65. MTs attended unpaid training sessions. Defendants' Transcription Supervisor tracked training attendance for annual performance evaluations.

66. Defendants further required MTs to go to meetings in the Oklahoma City office, take yearly HIPAA computer courses and other training without compensation.

## *Defendants' Further Knowledge of Time Worked by MTs Through Close Supervision*

67. Defendants' Transcription Supervisor closely monitored MTs and their production quality, quantity, and other work performed.

68. Defendants' Transcription Supervisor monitored line counts on Monday mornings, and would commonly send out emails during the week to MTs regarding their line counts and the need for them to

meet line count expectations, as well as quality and timeliness requirements.

69. Defendants did, or had the ability to, track MTs time worked using their medical transcription platform technology, third-party Kronos software, and other internal and third-party analytics software and production tracking information available to Defendants.

70. Defendants' Transcription Supervisor was aware that MTs routinely worked seven days a week to meet line and other production expectations.

71. Defendants' Transcription Supervisor required MTs to notify Defendants of any unavailability and to request approval for any unavailability to ensure that STATs were directed to available MTs.

72. The records generated by the transcription/editing software, including but not limited to Cerner, indicate MTs' log-in and -out information. Records showing VPN log-in and -out information most likely also reflect the same.

73. Based on information and belief, Defendants used KRONOS timekeeping and attendance software to convert lines produced into hours of production time worked.

74. Despite their knowledge that Plaintiffs were non-exempt employees who performed additional work beyond line production, Defendants ended their practice of tracking all time worked prior to the start of the proposed Class Period.

75. Defendants made active efforts to misinform employees of their rights and to conceal known violations, thereby justifying equitable tolling of the statute of limitations.

## Collective Action Allegations

76. Plaintiffs, individually and on behalf of other similarly situated MT employees of Defendants, seek relief on a collective basis based on Defendants' failure to provide premium pay for all hours worked in excess of forty (40) per workweek during at least one (1) workweek over the past three (3) years.

77. Defendants required MTs to perform the same job duties and tasks, subject to the same production, quality, and timeliness standards and expectations.

78. Defendants compensated MTs based on the same pay policies and criteria (*i.e.*, flat rate per line of transcription produced; no overtime pay; no compensation for other job duties and tasks; equating lines production with hours worked).

79. Defendants established a common plan or policy to not pay overtime premiums to MTs, who Defendants knew to be non-exempt employees.

80. Defendants established a common plan or policy of refusing to pay MTs for job duties and tasks beyond line production.

81. Defendants established a common plan or policy of equating line counts with hours worked.

82. Defendants established a common plan or policy to not track, or maintain accurate records of, hours worked by MTs, who Defendants knew to be non-exempt employees.

## Count I

## (Failure to Pay Overtime in Violation of the FLSA)

83. Plaintiffs hereby incorporate and re-allege, in full, all preceding paragraphs of this Complaint.

84. At all times relevant herein, Plaintiffs and similarly situated employees were entitled to the rights, protections, and benefits provided under the FLSA.

85. The FLSA requires employers to pay non-exempt employees one and one-half times the regular rate of pay at which they are employed for hours worked in excess of forty (40) per workweek. 29 U.S.C. § 207.

86. Defendants failed to pay Plaintiffs and those similarly situated overtime compensation at the statutorily prescribed rate of one-and-one-half times the regular rate of pay for all hours worked in excess of forty (40) per work week.

87. Plaintiffs and those similarly situated are entitled to an award of liquidated damages. Defendants will not be able to meet their burden of proving that it acted in good faith and with objectively reasonable grounds for believing that their conduct was not in violation of the FLSA.

88. Defendants' violations of the FLSA as stated herein are willful violations resulting in a three (3) year statute of limitations as Defendants knew, or showed reckless disregard for whether, their conduct violated the FLSA specific to Plaintiffs and those similarly situated.

89. Defendants violated the FLSA by failing to keep accurate records of all time worked by, and wages and wage adjustments paid to, Plaintiffs and those similarly situated.

90. Defendants failed to post notice of FLSA rights and misinformed employees as to their rights justifying equitable tolling of the statute of limitations.

91. Defendants are liable under the FLSA for unpaid overtime, liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, court costs and litigation costs.

WHEREFORE Plaintiffs seek relief and judgment against Defendants, individually and as a collective action, as follows: notice of this action be provided to all similarly situated persons as a collective action under the FLSA; judgment against Defendants for violation of the FLSA; an award of unpaid wages; incentive payment to the representative Plaintiffs; determination that Defendants' FLSA violations were willful; imposition of liquidated damages against Defendants; pre-judgment and post-judgment interest as provided by law; an award of reasonable

attorneys' fees, litigation costs and court costs incurred; and for such other and further relief as the Court deems just and proper.

## Demand for Jury Trial

Plaintiffs and those similarly situated demand a jury trial on all claims presented herein.

Respectfully submitted,

/s/ D. Colby Addison
D. Colby Addison, OBA #32718
Chris Hammons, OBA #20233
LAIRD HAMMONS LAIRD, PLLC
1332 SW 89th Street
Oklahoma City, OK 73159
Telephone: 405.703.4567
Facsimile: 405.703.4067
E-mail: colby@lhllaw.com


Kevin J. Dolley, USDC No. 54132MO
(Application for Pro Hac Vice
Admission Pending)
LAW OFFICES OF KEVIN J. DOLLEY, LLC
2726 S. Brentwood Blvd.
St. Louis, MO 63144
Telephone: 314.645.4100
Facsimile: 314.736.6216
Email: kevin@dolleylaw.com

ATTORNEYS FOR PLAINTIFFS AND THOSE
SIMILARLY SITUATED

*Rebecca Parker* **VERIFICATION**

I, ~~Tuesdae Bowling~~, verify under penalty of perjury that the foregoing Verified

Complaint is true and correct to the best of my knowledge, information, and belief.

Dated: **5-31-17** .


*Rebecca J. Parker*
Sign Name

## VERIFICATION

I, Kimberly McKinzie, verify under penalty of perjury that the foregoing Verified
Complaint is true and correct to the best of my knowledge, information, and belief.

Dated: _5-31-17_ .


_Kimberly McKinzie_
Sign Name

## **VERIFICATION**

I, Brenda Simmons, verify under penalty of perjury that the foregoing Verified Complaint is true and correct to the best of my knowledge, information, and belief.

Dated: 5/31/2017 .


Brenda Simmons
Sign Name

## **VERIFICATION**

I, Tuesdae Bowling, verify under penalty of perjury that the foregoing Verified Complaint is true and correct to the best of my knowledge, information, and belief.

Dated: _MAY 31, 2017_ .


TUESDAE BOWLING
Sign Name